[Nos. 44376, 44377. En Banc. January 7, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. WALTER GREGORY McKINNON, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. LARRY RAYMOND YATES, *Appellant.*

*Kenneth H. Davidson* (of *King, King & Davidson*), for appellant McKinnon.

*Graham, Cohen & Wampold* and *R. Joseph Wesley,* for appellant Yates.

*Christopher T. Bayley, Prosecuting Attorney,* and *Charles S. Hamilton III, Deputy,* for respondent.

HAMILTON, J.—In separate trials, defendant (appellant) Yates was convicted of possession of a controlled substance with intent to deliver, and defendant (appellant) McKinnon was convicted of two counts of possession of a controlled substance. The cases were consolidated for appeal. Both cases involve the contention that evidence seized by the defendants' high school principal was improperly admitted against them.

On November 4, 1974, the chief of police for Snoqualmie, Washington, received a call from a confidential informant that the defendants, who were high school students, were selling "speed." The informant described the clothes which the defendants were wearing that day, and pinpointed in which pockets the "speed" was located. The police chief immediately contacted the principal of the defendants' high school and related the above information. The principal responded that he would talk to the defendants and get back to the chief of police.

The principal then contacted defendant Yates and brought him to the principal's office. At the same time the vice–principal contacted defendant McKinnon and took him to the vice–principal's office. The principal asked defendant Yates to empty his pockets. Defendant Yates then emptied all of his pockets, except the one in which the informant had said the "speed" would be located. The principal then reached into that pocket and found two packages of white pills. Meanwhile, the vice–principal was having defendant McKinnon empty his pockets. The principal then entered the vice–principal's office and reached into defendant McKinnon's pocket—the pocket in which the informant had said the "speed" was located—and found several packets of white pills. Laboratory analyses later confirmed that the pills found on both defendants' persons were amphetamines.

The principal then telephoned the chief of police who went to the school and placed both students under arrest. While the police chief was driving the defendants to the police station, he saw defendant McKinnon take a bag out of his pocket and place it under the car seat. When they arrived at the police station, the chief of police told defendant McKinnon to go back out to the car and retrieve the bag he had secreted. Defendant McKinnon did so, and then voluntarily surrendered another bag. Laboratory analysis confirmed that these two bags contained marijuana. Later that same day, both defendants signed written statements regarding the drugs.

Defendants contend that the searches of their persons by the high school principal violated their right to be free from unreasonable searches as guaranteed to them by the fourth amendment to the United States Constitution,[1] and therefore the fruits of these searches should have been excluded under *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961), because the principal is a state official. Although there is a split of authority whether school officials are governmental agents within the meaning of the Fourth Amendment, *compare In re Donaldson,* 269 Cal. App. 2d 509, 75 Cal. Rptr. 220 (1969); *Mercer v. State,* 450 S.W.2d 715 (Tex. Civ. App. 1970), *with State v. Baccino,* 282 A.2d 869, 49 A.L.R.3d 973 (Del. Super. Ct. 1971); *State v. Mora,* 307 So. 2d 317 (La. 1975); and *Doe v. State,* 88 N.M. 347, 540 P.2d 827 (1975), we need not decide this question for we believe the search conducted by the principal did not violate defendants' Fourth Amendment rights.

 The Fourth Amendment does not prohibit all searches, but only unreasonable searches. The question of reasonableness always involves balancing the governmental

---

[1]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. 4.

interests with the individual's right to be free from instrusions. *See Camara v. Municipal Court,* 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). When law enforcement officers are conducting a search, they are generally required to secure a search warrant issued upon a showing of probable cause, except for a few "jealously and carefully drawn" exceptions. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). However, in some situations, the search and seizure is allowed upon less than the traditional standard of probable cause because the governmental interests outweigh the intrusion. *See Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) (stop and frisk); *United States v. Brignoni–Ponce,* 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975) (stopping of vehicles by roving border patrol); *United States v. Martinez–Fuerte,* 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976) (stopping vehicles at a routine border checkpoint).

It is well established that students do not lose their constitutional rights when they enter the school grounds. *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969). The Washington State Board of Education has recognized the student's right to be secure against unreasonable searches and seizures. *See* WAC 180–40–095(3). In *Tinker,* certain students wore black armbands to express their objections to the hostilities in Vietnam. The students were suspended until they would return to the school minus their armbands. The Supreme Court found that the wearing of armbands was closely akin to "pure speech" and did not interfere with school operations or with the right of other students to be secure and to be left alone. It held that the wearing of these armbands was speech protected by the first amendment to the United States Constitution and that students could not be suspended for expressing their nondisruptive objections to the armed conflict in Vietnam:

The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the

purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. *Burnside v. Byars,* [363 F.2d 744, 749 (5th Cir. 1966)]. *But conduct by the student, in class or out of it, which for any reason— whether it stems from time, place, or type of behavior— materially disrupts classwork or·involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.*

(Footnote omitted. Italics ours.) *Tinker v. Des Moines Independent Community School Dist., supra* at 512–13. The protection of schoolroom decorum was also affirmatively recognized in *Goss v. Lopez,* 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975).

Although *Tinker* and *Goss* did not deal with students' Fourth Amendment rights, we believe this same recognition of schoolroom decorum is appropriate when dealing with Fourth Amendment rights. In Washington, students must attend school through the age of 14 and in most cases through the·age of 17. RCW 28A.27.010. Certificated school personnel are given the authority and indeed have the duty to maintain good order and discipline in the schools. RCW 28A.67.100; WAC 180–44–020(1). This duty to maintain order and discipline is not founded upon arbitrary grounds. The school's function is to educate children, both intellectually and socially, to prepare them to properly function in our evermore complex adult world. Because of the number of students brought together during a school day, the educational function can only be accomplished by

maintaining order and discipline in the school. Further, certificated school personnel must maintain schoolroom decorum in order to protect other students' rights to be secure and to be left alone.

The high school principal is not a law enforcement officer. His job does not concern the discovery and prevention of crime. His duty as the chief administrator of the high school includes a primary duty of maintaining order and discipline in the school. In carrying out this duty, he should not be held to the same probable cause standard as law enforcement officers. Although a student's right to be free from intrusion is not to be lightly disregarded, for us to hold school officials to the standard of probable cause required of law enforcement officials would create an unreasonable burden upon these school officials. Maintaining discipline in schools oftentimes requires immediate action and cannot await the procurement of a search warrant based on probable cause. We hold that the search of a student's person is reasonable and does not violate his Fourth Amendment rights, if the school official has reasonable grounds to believe the search is necessary in the aid of maintaining school discipline and order. *See State v. Baccino, supra; State v. Young,* 234 Ga. 488, 216 S.E.2d 586 (1975); *In re State in the Interest of G. C.,* 121 N.J. Super. 108, 296 A.2d 102 (1972); *Doe v. State, supra; People v. D.,* 34 N.Y.2d 483, 358 N.Y.S.2d 403, 315 N.E.2d 466 (1974); *People v. Jackson,* 65 Misc. 2d 909, 319 N.Y.S.2d 731 (1971), *aff'd,* 30 N.Y.2d 734, 333 N.Y.S.2d 167, 284 N.E.2d 153 (1972). *Contra, State v. Mora, supra.* The factors to be judged in determining whether the school official had reasonable grounds are the child's age, history, and school record, the prevalence and seriousness of the problem in the school to which the search was directed, the exigency to make the search without delay, and the probative value and reliability of the information used as a justification for the search. *See Doe v. State, supra; People v. D., supra.*

Turning to the facts in the instant case, we think it is clear that the principal did have reasonable grounds upon which to base his search. He received a telephone call from the chief of police who relayed the information about possible distribution of drugs in the school. The information included a description of the defendants' clothing and the pockets in which the "speed" was located. Drug use and abuse by secondary students are not unknown, and eyes should not be closed to the practices. There can be no doubt that the selling of drugs in a school is highly disruptive of school discipline and order. When the principal was confronted with information that "speed" would be distributed to other members of the student body, he had no alternative but to conduct the search without delay. Furthermore, delay could greatly enhance the possibility that the drugs might be destroyed or otherwise disposed of.

Defendants further argue that, even if a school official may conduct a search based on reasonable grounds, these particular searches were invalid because they were instigated by the chief of police. Although joint action by a law enforcement officer and a private person may constitute police action, *see State v. Birdwell*, 6 Wn. App. 284, 288, 492 P.2d 249 (1972), joint action was not present in these cases. Both trial courts found that at no time did the chief of police instruct the principal to search the defendants or detain them. We have independently searched the record and find no evidence that the police chief directed or even suggested to the principal that a search should be conducted. He merely relayed the information he had received to the principal, and the principal then acted independently in contacting defendants McKinnon and Yates. The fact that the principal called the chief of police after conducting the search does not indicate complicity. If the principal had received this information from sources other than the police, he then would be under a duty both to conduct a search and notify the police of his discoveries. We find no difference here where the information was merely relayed to the principal by the chief of police.

Defendants' other assignments of error concern their written statements at the police station. They do not contend that the statements were involuntarily given, but rather hinge their argument on the "fruit of the poison tree" doctrine. Because the searches of their persons did not violate their Fourth Amendment rights, the statements were not tainted and hence were properly admitted against them.

The respective judgments are affirmed.

STAFFORD, C.J., and HUNTER, WRIGHT, BRACHTENBACH, and HOROWITZ, JJ., concur.

ROSELLINI, J. (dissenting)—In response to a telephone call from the local chief of police—and with no other basis for his action—the defendants' high school principal called them to his office, searched them, found controlled substances in their possession, and called the police to come and arrest them. All of this occurred within a space of 7 minutes. I cannot conceive of a situation giving rise to a stronger inference that the school official acted in conjunction with and as an agent of the police.

Where the evidence shows that such a relationship existed, the fourth amendment to the United States Constitution requires that, unless the principal had probable cause to make an arrest, evidence obtained in the attendant search should be suppressed. *Piazzola v. Watkins*, 442 F.2d 284 (5th Cir. 1971). *See also* Annot., *Admissibility, in Criminal Case, of Evidence Obtained by Search Conducted by School Official or Teacher*, 49 A.L.R.3d 978, 987–89 (1973), and cases cited therein. The majority admits that such cause did not exist. The search was based upon an anonymous tip, unsupported by other facts then known to the officer or subsequently learned by investigation. Such cause is not sufficient. *In re Little v. Rhay*, 68 Wn.2d 353, 413 P.2d 15 (1966).

In my view, the question whether school officials, solely for the purpose of maintaining order and a proper educational atmosphere, may make searches of individuals or their property with less than probable cause is not before the court. However, the majority has found it necessary to decide that question, since it does not recognize that this was a search involving active police participation.

In reaching its decision, the majority pays no attention to the fact that the fruits of the search were used for a criminal prosecution and not as the basis for a school disciplinary action, nor does it consider other important factors which are involved in the policy decision made here.

I do not believe that the students of this state should be subjected to a serious erosion of a very valuable and cherished constitutional right without some consideration being given to those matters. In my exploration of this subject, I have found that commentators, both in the legal profession and in the education profession, are not at all convinced that the denial of constitutional rights to students is beneficial to the educational atmosphere or process, or that the gain in discipline outweighs the loss of personal privacy and dignity. This loss, it must be remembered, is felt by the innocent as well as the guilty.

The arguments in favor of preservation of the students' rights are set forth, with scholarship, compassion, and wisdom, in a dissent to the case of *State v. Young,* 234 Ga. 488, 216 S.E.2d 586 (1975), written by Justice Gunter. That case, like this, involved a prosecution for illegal possession of drugs. There, however, the search was made without the connivance of law enforcement officials. Aside from that difference the cases are very similar, both in the factual situation and the majority's reasoning. My views are so well expressed therein and I am so little capable of improving upon it, that I have taken the liberty of quoting at length from that opinion, omitting those portions not relevant to the case before us. Justice Gunter said:

The Fourth Amendment stands as a bulwark between the government and a citizen. It means that the government, federal or state or local, which can act only through its agents–employees, cannot invade the person of a citizen by conducting an "unreasonable search and seizure." The Fourth Amendment, as well as its equivalent in the Georgia Constitution, reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; . . ."

In Camara v. Municipal Court, 387 U. S. 523 (1967), the Supreme Court of the United States held that the Fourth Amendment was applicable to a municipal housing inspector. Mr. Justice White, the author of the Court's opinion in that case, said: "The basic purpose of this Amendment, as recognized in countless decisions of this court, is to safeguard the privacy and security of individuals against arbitrary invasions by *governmental officials.*" P. 528. At p. 534 he said: "In summary, we hold that *administrative searches* of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, . . ." And at p. 539 he said that the approach taken by the court in that case "best fulfills the historic purpose behind the constitutional right to be free from unreasonable *government invasions* of privacy."

In See v. City of Seattle, 387 U. S. 541 (1967), the Supreme Court of the United States held the prohibition of the Fourth Amendment applicable to a representative of the City of Seattle Fire Department. The See case and the Camara case were decided on the same date, June 5, 1967.

In a case decided somewhat earlier, West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624 (1943), the Supreme Court of the United States said (p. 637): "The Fourteenth Amendment, as now applied to the States, protects the citizen against the state itself and all of its creatures—boards of education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to

discount important principles of our government as mere platitudes."

School administrators are considered government officials for purposes of the First Amendment and procedural due process requirements. See Tinker v. Des Moines &c. School District, 393 U. S. 503 (1969); Goss v. Lopez, 43 USLW 4181 (January 22, 1975). And it is now clearly established that a minor, whether a public school student or not, is a person under our Constitution and entitled to its protections. See Tinker and Goss, supra, and In Re Gault, 387 U. S. 1 (1967).

. . .

The majority asserts that searches of students in public schools by school officials "are reasonable under the Fourth Amendment on considerably less than probable cause. We conclude that in the good faith exercise of their public trust teachers and administrators must be allowed to search without hindrance or delay subject only to the most minimal restraints necessary to insure that students are not whimsically stripped of personal privacy and subjected to petty tyranny."

My view, of course, is that there must be "probable cause" for the search of a student in a public school by a school official, and such a search without "probable cause" violates the Fourth Amendment rights of a student as a citizen. A student, in my view, cannot be stripped of his Fourth Amendment rights at the entrance to the public school. Nor do I think that the Fourth Amendment rights of a high school student are a diluted version of the Fourth Amendment rights of an adult.

There can be no doubt that the need for order and discipline in a public school is a valid concern; but it must be conceded that the maintenance of order and discipline in a public school is one thing, and the acknowledgement and enforcement of constitutional rights in a criminal prosecution is an entirely different thing. This case has nothing to do with the maintenance of school discipline; the State is prosecuting a student for having committed an alleged crime; the student is entitled to a "fair prosecution" which is an integral part of a "fair trial"; if an adult had been searched by a government official in the manner that this student was searched, the adult would have, as the majority concedes, a right to suppress any item seized; the adult is entitled

to a fair prosecution as an integral part of a fair trial, but a student is not; and all of this adds up to making a public school student a second-class citizen not entitled to a fair prosecution by the State in a fair trial conducted by the State.

In the context of criminal prosecutions where Fourth Amendment rights must be acknowledged and enforced, I would hold that the standard of reasonableness for the search of a public school student is the same standard that must be applied to searches of adults, "probable cause."

I do not think that students have mere "minimal Fourth Amendment rights." And I certainly do not subscribe to the "adequate reason for the searches" enunciated by the majority in this case. As quoted from the majority opinion, the acts of the students in this case involved at most "a furtive gesture and an obvious consciousness of guilt by these students at the approach of the assistant principal." In fact, the record shows only that one of three students jumped up and put his hand down his pants. All three were searched. The record does not show whether the student in the present case was the one who jumped up. The majority's standard, subjectively applied by a school official, will justify the search of the person of any student in a public school. Such a standard is really no standard at all.

The majority has arrived at its standard by a general balancing test.[2] The majority has placed upon the scales the age of the student, the status of the student, the status of the administrator, the fact that the search occurred in the schoolhouse, and the "governmental interests of discipline, security, and enablement of the education function." But why each of these considerations is relevant for purposes of the Fourth Amendment and what weight each brings to the scales remain unclear.

For example, the majority stresses the age of the student, citing Ginsburg v. New York for the general proposition that children have lesser constitutional rights than adults. It may be that in some First Amendment contexts

---

[2]The majority of this court sets up some criteria for determining "reasonable cause" and then presumes that the facts of the case satisfy the criteria. Like the dissent said in *State v. Young*, 234 Ga. 488, 216 S.E.2d 586 (1975), it does not explain the relevance or the significance of the criteria.

the age of a person is relevant to the constitutional balance. Yet nobody has suggested that a high school student standing on the street has less freedom from governmental intrusions upon his privacy than an adult standing beside him. The relevance of age to Fourth Amendment problems is hard to perceive. Similarly, the fact that the search occurred in the schoolhouse cannot bring much weight to the scales if police in the schoolhouse are held to full warrant and probable cause requirements; and the courts addressing this issue here have so held. Piazzola v. Watkins, 442 F2d 284 (5th Cir. 1971); Waters v. United States, 311 A2d 835 (DC App. 1973); People v. Bowers, 72 Misc. 2d 800 (339 NYS2d 783)(NYC Crim Ct. 1973) affd. 77 Misc. 2d 697 (356 NYS2d 432)(App. Div. 1974).

What then are the relevant considerations? As the majority states, it is necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interest of the private citizen. Most searches are made in vindication of the State's interest in enforcing the criminal law, which includes, of course, an interest in protecting law abiding citizens from lawless ones. Ordinarily, a lower standard than probable cause is justified only when some additional interest is involved. Even then, the nature and extent of the governmental intrusion must be considered as well as the necessity for the particular form of intrusion. If the governmental interests can be served by a limited intrusion, then the Fourth Amendment permits only the limited intrusion. Terry v. Ohio, 392 U. S. 1 (1968); Camara v. Municipal Court, supra; United States v. Skipwith, 482 F2d 1272 (5th Cir. 1973).

The reasoning of the majority places no limits on the nature and extent of the search a school official may make, as long as the search is justified in the first instance under the majority's "minimal standard." Furthermore, the facts of the case do not show a limited intrusion of the kind associated with the relaxed standards of reasonableness in Camara and Terry. The search here was personal in nature and aimed at the discovery of evidence of specific misconduct. See Camara, 387 U. S., p. 537. Compare Sibron v. New York, 392 U. S. 40

(1968), where emptying a suspect's pocket was not justified by the same considerations which justified a pat-down search in Terry.

The governmental considerations said to be in issue are not very convincing in the context of this case. The facts give not the slightest hint of any threat to "the enablement of the education function" in the conduct of the students before the search. If we are to restrict a student's privacy in his own person in the name of education, let us do so on a record which provides evidence of potential disruption or disorder. There is none here. Compare Tinker v. Des Moines School District, supra, 393 U. S., p. 511. Furthermore, in the context of the present case, the government's interest in discipline and security is indistinguishable from the general law enforcement interest. See Buss, "The Fourth Amendment and Searches of Students in Public Schools," 59 Iowa L. Rev. 739 (1974).

What of the special status of the school official? Most courts ruling on schoolhouse searches have stressed this factor, noting that at common law school officials are said to stand in loco parentis. The majority here correctly avoids reliance on common law maxims, although much of the reasoning has the same familiar ring. It cannot be doubted that a school official occupies a status different from a police officer for many purposes. But the school official also has essentially law enforcement responsibilities. When he acts upon a suspicion of specific misconduct and conducts an investigation he is performing a law enforcement function. "What so many of the courts persist in talking about as a parental relationship between school and the student is really a law enforcement relationship in which the general student society is protected from the harms of anti-social conduct. As such, it should be subjected to law enforcement rules. Besides presenting a false picture of a person acting in a parental fashion, casting the school administrator in the parental role diverts attention from the relevant considerations that might argue for or against permitting the search." Buss, supra, at p. 768.

The schoolhouse search presents a unique situation. The question is whether its unique aspects reduce high school students to second-class citizens under the Fourth

Amendment. I have examined what the case law establishes as the primary considerations under the Fourth Amendment and have tried to examine the facts of this particular case in the light of those considerations. I conclude that a school official performing a law enforcement function conducted a search of the person. I find no basis on this record for relieving the official of the probable cause requirement. Furthermore, I conclude that a search of three students after one of them jumps up and puts his hand down his pants is unreasonable.

Underlying the position of the majority in this case is a concern about the potential civil liability of school officials for violations of Fourth Amendment rights. The answer to that problem is not to apply a watered–down Fourth Amendment standard in criminal prosecutions but to recognize a qualified immunity for school officials in civil actions. The Supreme Court has recently done just that. Wood v. Strickland, __ U. S. __ (95 SC __, 43 LE2d 214) (1975). The effect of the present decision is to combine that qualified immunity with a "minimal standard" of reasonableness and an abandonment of the right to suppress evidence. The result is that there is *no effective judicial sanction for violations of a high school student's Fourth Amendment rights by a school official.*

*State v. Young, supra* at 500–01, 507–11.

William G. Buss, whose article in 59 Iowa L. Rev. 739 (1974) is mentioned in the above opinion, is the author of a monograph entitled "Legal Aspects of Crime Investigation in the Public Schools" from which that article was excerpted. The monograph was commissioned by the ERIC Clearinghouse on Educational Management and published by the National Organization on Legal Problems of Education. In the excerpt, after reviewing the leading Fourth Amendment cases, and the cases involving school searches, Buss undertakes to balance the interest in law enforcement and school discipline against the right to privacy. His conclusion is that the latter has been unnecessarily and unwisely invaded in searches which the courts have upheld, which involved less than probable cause to believe that the student was engaged in illegal activity.

Buss argues that the exceptions to the warrant requirement[3] would seldom be applicable in the school environment, where students are subject to restraints upon their movements which do not exist in the society outside the school doors. Emergency situations do arise, as in one case where a student had a gun, but in most of the cases which have come before the courts, there was time to get a warrant before the search was made.

This writer argues that because students are compelled to attend school, either by law or by economic and social pressures, the courts should be more diligent in the protection of their constitutional rights, not less so than they are

[3]The circumstances under which the United States Supreme Court has permitted searches to be conducted without probable cause are:

(1) Where the arresting officer has reasonable cause to believe that he is dealing with an armed and dangerous person, he may "stop and frisk" him for a weapon. *Terry v. Ohio,* 392 U.S. 1, 21–22, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

(2) A warrant for the search of a designated area of houses may issue upon a showing that there are "reasonable administrative or legislative standards for conducting the inspection with respect to a particular dwelling," for health and safety purposes. For such administrative searches, the strict requirement of personal knowledge of the officer is relaxed. *Camara v. Municipal Court,* 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967).

(3) Warrantless searches at borders for aliens or contraband are held to be reasonable because of the legitimate interest in self-protection, where there is reasonable cause to believe that laws are being violated. *Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1925).

(4) Where there is reasonable cause to believe that contraband is being carried, an automobile may be searched, without a warrant. The emergent circumstance that the contraband may be carried away out of the jurisdiction and its contents destroyed was the rationale for this exception. *Carroll v. United States, supra.*

Lower federal courts have also held that passengers (and their luggage) boarding airplanes may be searched, during a time of a significant number of hijackings. *United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973); *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973).

(5) No warrant is necessary where the defendant consents to the search. *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968); *Katz v. United States,* 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967).

(6) An object in plain view of the government official can be seized, provided he is rightfully in the position to have that view. *Harris v. United States,* 390 U.S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992 (1968); *Ker v. California,* 374 U.S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963).

It was not contended in this case and the lower court did not find that any of these exceptions was applicable.

where the adult is in a given place by choice. He also points out the fallacy of the in loco parentis rationale as applied in this setting, stating that it is obvious that the school official displays none of the protective concern for the student which is an expected characteristic of parentage. The school official, he says, acts as a representative of government—not a representative of parents—when he takes a child in hand and turns him over to the police.

The writer concludes that the failure of the courts to weigh the students' right to privacy against the law enforcement interest, or "educational environment" interest, and their assumption that the latter are controlling, sacrifices long-term principle to short-term expediency. Furthermore, he does not subscribe to the view that the denial of students' constitutional rights is conducive to the health and welfare of the educational environment. By the way they are treated more than by what they are told, students learn to respect the constitution or to hold it in contempt.

I find these arguments exceedingly persuasive. They indicate that assumptions which courts have apparently made—to the effect that the minimizing of certain constitutional rights is in the public interest—have very little validity when analyzed and viewed against the background of actual human experience. As guardians of the constitution, I believe it is our duty to make our assumptions in favor of the rights guaranteed therein and to zealously guard against their erosion.

I would reverse the judgment and order a new trial, with directions that the illegally obtained evidence and its fruits should be suppressed.

UTTER and DOLLIVER, JJ., concur with ROSELLINI, J.

Petition for rehearing denied February 24, 1977.