[No. 48472-4.   En Banc.   December 9, 1982.]

KING COUNTY, *Petitioner,* v. IRENE PRIMEAU, *Respondent.*

*Norm Maleng, Prosecuting Attorney,* and *Robert D. Johns, Deputy,* for petitioner.

*Frank Bean,* for respondent.

DOLLIVER, J.—Mrs. Irene Primeau is the owner of approximately 13½ acres of land near Kirkland. The differing ways in which this property is viewed by King County and by Mrs. Primeau are illustrated by the trial briefs of each party. According to the County:

> The neighborhood is a typical subdivision single family residence area. The subject property contains a single family residence plus a number of storage buildings, an old house trailer and various other structures. In addition, the premises are littered with discarded appliances, junked cars, broken and used lumber, and all manner of garbage and debris. A garbage dump exists on the rear of the property.
>
> The house itself is in a deteriorated and dangerous condition. The plumbing is largely inoperable, portions of the siding and roof are missing or damaged, the electrical system is very substandard, and the chimney is damaged. Several of the rooms are completely filled with debris, creating a substantial fire hazard.
>
> Mrs. Primeau maintains a substantial collection of domestic animals on the property, including dogs, cats, pigs, goats, chickens and ducks. As a consequence, large quantities of animal feces have accumulated on the property. The combination of these problems has created a substantial rodent problem in the neighborhood.

Mrs. Primeau sees things in a somewhat different light:

> Farm animals have always been present on these premises. Pigs were raised commercially for many years until the combined actions of King County and some neighbors forced its closure. Cows, goats, chickens, ponies,

geese, dogs, and cats and other animals have been raised and kept on this farm. Many of these animals had been abandoned, lost, or were sick or injured. Defendant's farm became known as a haven for such animals. Many of the animals had been raised from their infancy and kept strictly as pets.

As a matter of necessity in earlier years Defendant and her husband collected and recycled used materials for their own personal use. To this day this is a habit that Defendant adheres to. Therefore, there exists stacks of fencing material, appliances, boxes, crates, and other material which has a useful and intrinsic value to Defendant.

Within Defendant's house there exists a minimum of modern day conveniences. Her house is heated by a wood stove, her windows are boarded shut to conserve heat, her hot water tank has been disconnected to save electricity. Many of the personal belongings and effects of her children and her deceased husband have been kept and stored by Defendant in the now unused rooms of her house. In her own words this is her "houseful of memories."

A view congruent with that of King County was held by one of Mrs. Primeau's neighbors, and on June 23, 1978, King County Animal Control received a complaint from this neighbor, Marlene Berry. Ms. Berry complained Mrs. Primeau was mistreating many of her animals. Ms. Berry also stated Mrs. Primeau's plumbing was inoperable, and raw sewage from the house drained onto Mrs. Primeau's property.

Shortly before receiving Ms. Berry's complaint, Officer Chuck Wadkins of King County Animal Control had driven by the Primeau property and observed several unlicensed dogs and various mistreated and malnourished animals. Based on a statement by Officer Wadkins, a King County District Court judge issued a search warrant on June 19, 1978, authorizing entry onto the Primeau property to search for animals being cruelly treated and dogs without valid licenses. When King County Animal Control officers executed the warrant, they found 7 ponies and donkeys and 22 dogs, all suffering from malnutrition, and the carcass of

an unrecognizable large animal which had been dead for 2 to 4 months. The Animal Control officers seized the animals, and cited Mrs. Primeau for eight counts of cruelty to animals and one count of operating a kennel without a license. The Animal Control officers subsequently warned the King County Building and Land Development Division about several health and safety hazards and potential housing code violations they observed on the Primeau property.

In August 1978, in response to information received from Animal Control and Ms. Berry's complaint, the King County Building and Land Development Division initiated an investigation of Mrs. Primeau's property. Norman Peterson, Supervisor of the Code Enforcement Section of the Building and Land Development Division, drove by the Primeau property and observed several violations of the Uniform Building Code and the Uniform Code for the Abatement of Dangerous Buildings, as adopted in section 2 of King County Ordinance 3647 (1978). Mr. Peterson made no attempt to enter the property or contact Mrs. Primeau personally. Rather, he applied for a search warrant to inspect the Primeau property. After receiving Mr. Peterson's affidavit and Ms. Berry's complaint, a King County Superior Court judge determined probable cause existed to suspect Mrs. Primeau of violating the housing code and dangerous buildings code and issued a warrant to search the Primeau property.

On August 10, 1978, Mr. Peterson, County Building Inspector Karl Korshaven, and two King County Sheriff's deputies executed the warrant to search the Primeau property. The officers knocked on the door of the Primeau residence, announced their purpose, and personally served Mrs. Primeau with the warrant. Mrs. Primeau asked that the inspection be postponed until her attorneys could be present. The officers denied her request and proceeded with the inspection. During the inspection, Mr. Peterson and Inspector Korshaven observed a number of housing code and dangerous buildings code violations.

Based on the observations of Mr. Peterson and Inspector Korshaven, King County filed a civil action against Mrs. Primeau on November 20, 1978. The County sought an order requiring Mrs. Primeau to correct the various housing code and dangerous buildings code violations. In her answer, Mrs. Primeau admitted six violations, admitted two others in part, and denied the remainder.

On September 26, 1979, during the discovery process, King County requested Mrs. Primeau to permit an inspection of her property pursuant to CR 34. After initially acceding to the County's request, Mrs. Primeau refused to allow the inspection. On February 27, 1980, however, the King County Superior Court granted King County's motion to compel discovery and ordered Mrs. Primeau to permit an inspection. During the court ordered inspection, County building inspectors gathered further evidence of housing code and dangerous buildings code violations.

At the commencement of trial, Mrs. Primeau moved to suppress all evidence obtained by Building and Land Development Division officers during the two inspections of the Primeau property. Mrs. Primeau claimed a search warrant could not be obtained until after the person had been asked to consent to a search. Since before obtaining the August 10, 1978, warrant Mr. Peterson did not request consent to an inspection, Mrs. Primeau asserted the warrant was invalid. She further argued that evidence obtained during the subsequent search should have been suppressed under the "fruit of the poisonous tree" doctrine. The King County Superior Court granted Mrs. Primeau's motion to suppress the evidence and entered an order dismissing the case against her. The Court of Appeals affirmed. *King Cy. v. Primeau*, 30 Wn. App. 664, 637 P.2d 987 (1981). We accepted review.

The ordinance which is the subject of dispute between the parties is King County Ordinance 2909, § 104 (1976). It states:

A. Whenever necessary to make an inspection to enforce or determine compliance with the provisions of

any land use or public health ordinance, or whenever a director or his duly authorized inspector has cause to believe that a violation of any land use or public health ordinance has been or is being committed, the inspector may enter any building, structure, property or portion thereof at reasonable times to inspect the same.

B. If such building, structure, property or portion thereof is occupied, the inspector shall present identification credentials, state the reason for the inspection, and demand entry.

C. If such building, structure, property or portion thereof is unoccupied, the inspector shall first make a reasonable effort to locate the owner or other persons having charge or control of the building, structure, property or portion thereof and demand entry. If the inspector is unable to locate the owner or such other persons, and he has reason to believe that conditions therein create an immediate and irreparable land use or health hazard, he shall make entry.

D. It is unlawful for any owner or occupant or any other person having charge, care or control of any building, structure, property or portion thereof to fail or neglect after proper demand has been given to permit prompt entry thereon where the inspector has reason to believe that conditions therein create an immediate and irreparable land use or health hazard.

E. Unless entry is consented to by the owner or person in control of any building, structure, property or portion thereof or conditions are believed to exist which create an immediate and irreparable land use or health hazard, the inspector, prior to entry, shall obtain a search warrant as authorized by the laws of the State of Washington.

■ Defendant contends the County inspector cannot obtain a warrant under section 104(E) until after the inspector has requested an inspection under section 104(B). We do not share this view. The phrase "[u]nless entry is consented to" in section 104(E) does not create a condition precedent. Rather it gives an option: either gain entry by consent or obtain a warrant. *See McCrabb v. Moulton,* 124 F.2d 689, 691 (8th Cir. 1942); *Griffith v. Cedar Creek Oil & Gas Co.,* 91 Mont. 553, 558–59, 8 P.2d 1071 (1932).

Plaintiff gives some examples to illustrate the vice of the

position of defendant:

Example 1: Store Clerk to Customer: "Unless you pay by credit card, you must pay with cash." Defendant would construe this to mean: "Before you pay with cash, you must pay with a credit card."

Example 2: Parent to Child: "Unless you go to school, you must stay in bed all day." Defendant would construe this to mean: "Before you stay in bed all day, you must go to school."

Example 3: First Pedestrian to Second Pedestrian: "Unless I open the door, you must open it yourself." Defendant would construe this to mean: "Before you open the door yourself, I must open it."

The statutory scheme in section 104 providing for entry by an inspector is: (1) obtain entry by consent; or (2) believe condition exists which creates "an immediate and irreparable land use or health hazard"; or (3) obtain a search warrant. King County properly exercised the third option.

■ Next, although she does not dispute the existence of probable cause for the issuance of a warrant, defendant maintains there must be prior notice before a search warrant can be obtained. We find nothing in the ordinance or in the cases cited by defendant to justify this position. Neither *Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972) nor *Sniadach v. Family Fin. Corp.,* 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969), which are cited by defendant, deals with search warrants. Therefore, *Fuentes* and *Sniadach* are irrelevant to the question whether search warrants may be served prior to notice and hearing.

*State v. Klinker,* 85 Wn.2d 509, 537 P.2d 268 (1975) is also inapposite. In discussing the seizure of property the court said:

[D]ue process requires a hearing before property is seized, and that that hearing must either include notice and the opportunity to appear being given the person subjected to the seizure *or must involve an ex parte finding by a judicial officer of a right to and a special*

*need for summary seizure or attachment subject to prompt later contest.*

(Italics ours.) *Klinker,* at 513. The thrust of *Klinker* is the need for a neutral magistrate to determine whether a warrant should issue. This did occur in the case before us.

Neither *Camara v. Municipal Court,* 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967) nor *See v. Seattle,* 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967), also cited by defendant, provides support for her argument. The thrust of the *Camara* and *See* decisions is that a *routine* administrative inspection must be preceded by a request for entry by the inspector desiring the search. The *Camara* Court distinguishes routine inspections from inspections instigated by the existence of probable cause of specific health and safety code violations. *Camara,* at 539–40. A request for entry need not be made before a warrant is issued in a nonroutine inspection. In the words of the *Camara* Court,

> warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry.

*Camara,* at 539–40. This constitutional test has been met by King County.

The Court of Appeals is reversed and this matter is remanded for trial.

BRACHTENBACH, C.J., STAFFORD, WILLIAMS, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

UTTER, J. (concurring in part, dissenting in part)—I agree that this matter should be remanded for a new trial; however, I cannot concur in the majority's analysis. I believe *Camara v. Municipal Court,* 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967), as well as article 1, section 7 of our state constitution, requires that a building code inspector request permission to search prior to obtaining a warrant. Such a requirement is an important aspect of the

privacy interest protected by the federal and state constitutions. Since there was no request made here, Mrs. Primeau's constitutional rights were violated and suppression of all evidence gathered in the second search was proper. The evidence gathered in the third inspection was not a fruit of the second search, however, and should therefore not have been suppressed.

## I

In *Camara,* the United States Supreme Court held that "administrative" searches, *i.e.,* searches intended to enforce regulatory laws such as fire, health, and housing codes, were not exempt from the warrant requirement of the Fourth Amendment. *Camara,* at 534. In addition, the Court noted that "it seems likely that warrants should normally be sought only after entry is refused". *Camara,* at 539. While on its face this language may seem equivocal, both the majority in *Camara* and the dissenting Justices appeared to recognize that it imposed a requirement that consent to an inspection be sought prior to a warrant (hereinafter referred to as a "request requirement"), at least for searches of private residences. Note, *Administrative Search Warrants,* 58 Minn. L. Rev. 607, 613 (1974) (hereinafter Minnesota Note); *see See v. Seattle,* 387 U.S. 541, 545 n.6, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967); *See,* at 554 (Clark, J., dissenting).

Reading such a requirement into both the Fourth Amendment and article 1, section 7 of our state constitution is supported by the policy considerations underlying those provisions. The basic test of a search's validity is a question of reasonableness—this involves "balancing the governmental interests with the individual's right to be free from intrusions." *State v. McKinnon,* 88 Wn.2d 75, 78–79, 558 P.2d 781 (1977); *Camara,* at 534–35. An important aspect of the right to be free from intrusions is the ability to control their timing and avoid complete surprise.

Most people do not feel compelled to erect a permanent barrier at their doorstep against entry by an inspector,

but they do desire protection from officious administrators who insist upon carrying out their duties without due regard for the resident's convenience, privacy, and dignity.

3 W. LaFave, *Search and Seizure* § 10.1(g), at 207 (1978). A request requirement does much to advance this interest.

While the balancing process does not lead to a request requirement where the governmental interest involved is enforcement of the criminal law, a different result is justified in the context of administrative searches. Presumably society's decision to rely primarily on noncriminal sanctions[1] for enforcement indicates a lesser societal interest. *See* Comment, *Constitutional Law—Administrative Searches and the Fourth Amendment: The Definition of "Probable Cause" in Camara v. Municipal Court of the City and County of San Francisco,* 36 UMKC L. Rev. 111, 122 (1968). Moreover, a request requirement applied to administrative searches will usually not hinder the societal interest there involved. Unlike searches intended to support criminal law enforcement, "compliance with the regulation is the only objective [of an administrative search] and it is fulfilled by hasty reparation before a delayed inspection." Comment, *Administrative Inspections and the Fourth Amendment—A Rationale,* 65 Colum. L. Rev. 288, 292 (1965).

In contrast to the government's interest in a search, the individual's interest in freedom from intrusion, "'would not appear to fluctuate with the "intent" of the invading officers.'" 3 W. LaFave, *supra* § 10.1(b), at 189. In either instance, the citizen is compelled to admit an unwanted visitor. Hence, in the case of an administrative search the balance tilts differently—toward a request requirement.

Independent protection is provided by our state constitution as well. Its express protection of citizens' "private

---

[1]While most regulatory codes allow enforcement by criminal as well as civil process, criminal sanctions, at least in the form of imprisonment, are rarely imposed in practice. *See* Note, *Enforcement of Municipal Housing Codes,* 78 Harv. L. Rev. 801, 824–25 (1965).

affairs" in addition to the privacy of their homes (*see* Const. art. 1, § 7; *compare* U.S. Const. amend. 4) makes a request requirement of even greater importance than under the federal constitution.[2] The opportunity to consent to an inspector's entry or perhaps arrange a more convenient time for inspection will go far toward enabling a citizen to keep private the "private affairs" she conducts in her home. 3 W. LaFave, *supra* § 10.1(g), at 208; Note, *Administrative Inspections and the Fourth Amendment,* 12 Washburn L.J. 203, 218 (1973); Note, *The Fourth Amendment and Housing Inspections,* 77 Yale L.J. 521, 533 (1968) (hereinafter Yale Note). The balance under our state constitution therefore tilts even more strongly toward a request requirement.

The County has argued that since most housing and building codes, including the ordinance involved here, provide parallel criminal and civil sanctions, they cannot be distinguished from any other criminal law. Hence, the County contends, reading *Camara* or our state constitution as I suggest conflicts with the rule that no prior request to search is required in enforcement of the general criminal law. In deciding whether to apply the *Camara* request requirement, the County continues, our courts will be required to evaluate the relative importance of different criminal provisions.

This argument goes too far. Our courts must already make such distinctions in deciding the applicability of *Camara*'s reduced probable cause standard. *See, e.g., State v. Mach,* 23 Wn. App. 113, 116, 594 P.2d 1361 (1979) (criminal prosecution for violation of state fisheries code "is not an end in itself but only one of the means of insuring compliance with the fisheries management program"). An appropriate test is whether the law in question "'is part of a

---

[2]Article 1, section 7 of our state constitution does provide broader protection than the Fourth Amendment. *State v. White,* 97 Wn.2d 92, 110, 640 P.2d 1061 (1982); *State v. Simpson,* 95 Wn.2d 170, 177–79, 622 P.2d 1199 (1980). In particular, our constitution places a greater emphasis on individual privacy. *Simpson,* at 178.

regulatory scheme which is *essentially* civil rather than criminal in nature". (Italics mine.) *Camara,* at 528. For example, our courts must distinguish between drug laws, for which a *Camara* area–wide inspection of a high drug crime area based on reduced probable cause would not be permissible, and the laws for which such inspections are permitted, such as building code provisions.[3] No additional distinction is required to decide the applicability of *Camara*'s request requirement.[4]

The majority appears to concede that *Camara* creates a request requirement in the case of "routine" administrative inspections. It limits the reach of *Camara,* however, to situations where probable cause to suspect a specific violation does not exist (majority, at 328) and also ignores the independent force of our state constitution. I believe it errs in doing so.

The language quoted by the majority in support of its limitation of *Camara* (majority, at 328) must be read in its broader context. Such a reading indicates that the Court's primary aim was to make it clear that the traditional "exigent circumstances" exception which is applicable in the criminal arena applies to administrative searches as well.

> [N]othing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in *emergency situations.* On the

---

[3]The rationale of *Camara* indicates that its reduced standard of probable cause does not apply to investigations aimed at specific individuals. The court enumerated three reasons why area–wide regulatory inspections were reasonable—their long history of judicial and public acceptance, the doubtful efficacy of any other canvassing technique, and the fact that such inspections are not personal in nature. *Camara,* at 537. None of these rationales apply to inspections which target individual citizens. Such specific targeting may be permissible, however, when authorized by statute and when an entrepreneur, by his entry into a particular business, "has voluntarily chosen to subject himself to a full arsenal of governmental regulation." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313, 56 L. Ed. 2d 305, 98 S. Ct. 1816 (1978); *State v. Mach, supra* at 115.

[4]Moreover, unlike the reduced standard of probable cause, this aspect of *Camara* is not limited by that case's rationale because it provides *greater* protection than that provided in the criminal context.

other hand, in the case of most routine area inspections, there is no *compelling urgency* to inspect at a particular time or on a particular day. Moreover, most citizens allow inspections of their property without a warrant. Thus, as a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing *immediate* entry.

(Citations omitted. Italics mine.) *Camara,* at 539–40. Only citizen complaints providing "satisfactory reason for securing immediate entry" negate the warrant and request requirements.[5] Housing and building code violations rarely provide such justification. 3 W. LaFave, *supra* § 10.1(f), at 205; Minnesota Note, *supra* at 637; Yale Note, *supra* at 534.

Neither does any other language in *Camara* support the majority's distinction between administrative searches which are supported by full probable cause and those which are not. Moreover, such a distinction has the perverse result of providing less protection for the privacy interests of a citizen who has been specifically targeted by the State than for citizens who are simply part of a general area–wide checkup. Yet the former type of search with its attendant "'damage to reputation resulting from an overt manifestation of official suspicion of [a violation of the law]'" seems

---

[5]It should be noted that one exigent circumstance negates the request requirement but not the warrant requirement. That is the situation where the violation in question is such that it can be quickly and temporarily concealed until after the inspection. *See See v. Seattle, supra* at 545 n.6; *United States v. Thriftimart, Inc.,* 429 F.2d 1006, 1009 (9th Cir.), *cert. denied,* 400 U.S. 926 (1970); Yale Note, *supra* at 535. In such a situation a prior request would be unnecessary; but, if the violation is not of an emergency nature, *Camara* would still require a warrant. This exception is narrower than it appears, however, for it applies only where there is a risk of temporary concealment *without remedy. See Colonnade Catering Corp. v. United States,* 410 F.2d 197, 203 (2d Cir. 1969), *rev'd on other grounds,* 397 U.S. 72, 25 L. Ed. 2d 60, 90 S. Ct. 774 (1970). If the only method of concealment is remedying the violation, then, as noted above, concealment is not a concern for it fulfills the only objective of inspection, compliance with regulations.

by far the more intrusive. 3 W. LaFave, *supra* § 10.1(b), at 189–90; *Camara,* at 537 (fact that area–wide inspection is not "personal in nature" lessens its intrusiveness).

## II

In the present case, there were three separate searches or inspections of Mrs. Primeau's property. The first was for animals which were being maltreated and unlicensed dogs. The second search was for violations of the King County building and housing codes. The third search was also for code violations. The first two searches were conducted pursuant to warrants based on ordinary probable cause; however, the County at no time requested permission from Mrs. Primeau to inspect the premises. The third search was an inspection authorized by a court discovery order under CR 34, after the County had initiated the instant action.

Though Mrs. Primeau has not challenged its validity, an analysis of the first search is nonetheless instructive. Despite the fact that Mrs. Primeau was apparently convicted of a criminal violation as a result of this search, laws governing treatment of animals and licensing of dogs are part of a total regulatory scheme essentially civil in nature. *See* King County Code 11.04.030 (requiring licensing of dogs), 11.04.250 (governing cruelty to animals), 11.04.180–.200 (allowing enforcement by abatement action, civil action, or criminal penalty). The request requirement was therefore applicable and hence, absent exigent circumstances, this first search was a violation of Mrs. Primeau's constitutional rights. This situation, however, exemplifies the manner in which exigent circumstances may eliminate the request requirement for administrative searches. Had the County first been required to request from Mrs. Primeau permission to inspect, she would have been forewarned and could have temporarily removed the animals until after the search. In such circumstances, an initial request to inspect is not required. *Cf.* Yale Note, *supra* at 535 (proposed notice requirement would not apply to inspections for violation of housing occupancy standards).

The second search, in contrast, *was* rendered invalid by the County's failure to first request permission to inspect. The request requirement was applicable, for the King County building and housing codes, to an even greater extent than the animal control laws, are also essentially civil regulatory schemes. *See* King County Code 23.08.010 (providing for enforcement of building and housing codes by abatement action, civil penalty, or criminal sanction). Secondly, there were no exigent circumstances here which negated the request requirement, at least for the inside of Mrs. Primeau's house. The only indoor violations alleged in the request for the warrant were broken and missing windows, malfunctioning plumbing, and large quantities of garbage in the house. There is no evidence that these violations were of a character which required immediate action; indeed, the County's decision to take the time to obtain a warrant virtually concedes this point. Neither was there any danger of concealment without remedy. Though the record is unclear, it appears doubtful that the plumbing problems could have been concealed in the few hours necessary to obtain the warrant. In any event, the only way in which any of these violations could have been concealed would be by repair or cleaning. Such methods of concealment, as noted above, do not constitute exigent circumstances which justify foregoing the request requirement, for they in themselves would have accomplished the County's goal.

The third inspection was not itself subject to any probable cause requirement since it was not a search but was instead conducted pursuant to a CR 34 discovery order. If that inspection was a "fruit" of the unlawful second inspection, however, the evidence derived from both of those inspections must be treated as unlawfully obtained. *Wong Sun v. United States,* 371 U.S. 471, 484, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). The basic question is "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means suffi-

ciently distinguishable to be purged of the primary taint.'" *Wong Sun,* at 488. If knowledge of the second piece of evidence is obtained from an independent source or after a considerable lapse of time, the causal chain is broken. *Wong Sun,* at 485; *State v. Byers,* 88 Wn.2d 1, 8, 559 P.2d 1334 (1977). In the present case, over a year elapsed between the second and third inspections. In addition, a review of the record convinces me that the County's complaint in the instant action, which gave rise to the third inspection, was as much based on independent sources of information as on the information derived from the second search. It must therefore be treated as lawfully obtained.

### III

The appropriate treatment for unlawfully obtained evidence in a criminal proceeding is well established—it is to be excluded. *Mapp v. Ohio,* 367 U.S. 643, 655, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961). The applicability of the federal exclusionary rule in civil proceedings such as the instant action depends, however, on the magnitude of the consequences involved (*see One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 701–02, 14 L. Ed. 2d 170, 85 S. Ct. 1246 (1965); 1 W. LaFave, *supra* § 1.5(e), at 98) and the incremental deterrent effect of applying the rule (*see United States v. Janis,* 428 U.S. 433, 453–54, 49 L. Ed. 2d 1046, 96 S. Ct. 3021 (1976); *cf. United States v. Calandra,* 414 U.S. 338, 351–52, 38 L. Ed. 2d 561, 94 S. Ct. 613 (1974) (rule did not extend to grand jury proceeding)).

In the instant case, these considerations provide ample justification for applying the rule. The consequences to Mrs. Primeau appear reasonably serious, for if the County perseveres she will apparently have to undertake major repairs. More important, application of the rule in this action is the only method by which we may deter the County from its unlawful behavior, since this is presumably the only action in which the County intends to use the evidence obtained. *Compare United States v. Janis, supra* at 448 (evidence unlawfully but independently obtained by

state officer could be used in federal civil tax proceeding; significant deterrent effect had already been attained due to exclusion at state level). Exclusion here is therefore crucial if there is to be any deterrent effect at all.

The applicability of the state exclusionary rule is even more clear. Unlike the federal rule, the emphasis of our state rule "is on protecting personal rights rather than on curbing governmental actions." *State v. White,* 97 Wn.2d 92, 110, 640 P.2d 1061 (1982). "[W]henever the right is unreasonably violated, the remedy must follow." *White,* at 110. Here the right was violated—the remedy must therefore follow, irrespective of the nature of the action in which it is invoked.

The trial court's suppression of the fruits of the second inspection of Mrs. Primeau's property was proper. The evidence derived from the third inspection, however, was not one of those fruits and it should not have been suppressed. The County's action should therefore not have been dismissed.

I would affirm in part and reverse in part and remand for trial.