[No. 86203-6. En Banc.]
Argued January 24, 2012. Decided August 2, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. JAMAR BILLY
DESHAWN MENEESE, *Petitioner*.

938

*Christopher Gibson* (of *Nielsen, Broman & Koch PLLC*), for petitioner.

*Daniel T. Satterberg, Prosecuting Attorney,* and *William L. Doyle* and *James M. Whisman, Deputies,* for respondent.

*Douglas B. Klunder, Travis Stearns, Sarah A. Dunne,* and *Nancy L. Talner* on behalf of American Civil Liberties Union of Washington Foundation amicus curiae.

*Robert C. Boruchowitz, Robert S. Chang, Lorraine K. Bannai,* and *David A. Perez* on behalf of Fred T. Korematsu Center for Law and Equality, amicus curiae.

*Hillary A. Behrman, David Huneryager,* and *Nicole K. McGrath* on behalf of TeamChild, amicus curiae.

*Kimberly D. Ambrose* on behalf of Seattle Young People's Project, amicus curiae.

¶1 OWENS, J. — Jamar Meneese appeals his conviction for unlawfully carrying a dangerous weapon on school grounds and for possessing a controlled substance. He claims the weapon, an air pistol, was seized in an unlawful search at school and should have been suppressed at trial. The question on appeal is whether the school search exception to the warrant requirement applies to the search conducted by the school resource officer (SRO). The exception allows school officials to search students without a warrant when the official has reasonable suspicion the search will produce evidence of a violation of law or school policy. *New*

*Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985).

¶2 The parties dispute whether the SRO was acting as a school official or a law enforcement officer at the time of the search. Here, the SRO is a fully commissioned, uniformed, law enforcement officer employed by the Bellevue Police Department. He arrested and handcuffed Meneese before searching his backpack. Moreover, after arresting Meneese, the focus of the investigation was no longer on informal school discipline, an underlying purpose behind the school search exception. Accordingly, given the overwhelming indicia of police action, the school search exception does not apply, a warrant supported by probable cause was required, and the weapon should be suppressed.

## FACTS

*Officer Michael Fry's Employment*

¶3 Officer Fry has been a full-time law enforcement officer with the Bellevue Police Department for over 15 years. Since the late 1990s, he has also served as the SRO at Robinswood High School in Bellevue. In 2008, the police department and the school district signed an agreement formalizing the relationship between Fry and five other officers and the school district. In return, the school district agreed to pay $90,000 per year to the police department. As an SRO, Fry was to "creat[e] and maintain[ ] a safe, secure, and orderly learning environment for students, teachers, and staff, through prevention and intervention techniques." Clerk's Papers (CP) at 26. He had no authority to administer school discipline, suspensions, or expulsions. He dressed in a standard-issue police uniform that bore the Bellevue Police Department insignia on it. He also drove a marked police vehicle to and from the school. And on a rare occasion, he would assist a fellow officer with an incident unrelated to the school.

*Meneese's Arrest and Subsequent Search*

¶4  In February 2009, Fry was conducting a routine check of the boys' restroom at Robinswood when he discovered Meneese standing at the sink holding a bag of marijuana in one hand and a medicine vial in the other. Fry confiscated the marijuana and escorted Meneese, along with his backpack, to the dean of students' office.

¶5  At the office, the dean took a passive role as Fry informed her about the situation. No school discipline took place at this time. Instead, Fry placed Meneese under arrest and requested a patrol unit to pick Meneese up for booking at the police station. While waiting on backup, Fry became suspicious that Meneese's backpack might contain additional contraband because it had a padlock on the handles. Fry attempted, and had limited success, to search the backpack without first removing the lock. When asked for the key, Meneese claimed to have left it at home. This made Fry even more suspicious. He then handcuffed and searched Meneese for the key, which Fry found. Upon opening the backpack, Fry discovered a replica Beretta air pistol (i.e., BB gun). And at this point, Fry read Meneese his *Miranda*[1] rights, and the backup officer arrived shortly thereafter to transport Meneese for booking.

*Procedural History*

¶6  Meneese stipulated to the above facts and was convicted of unlawfully carrying a dangerous weapon at school and of possessing less than 40 grams of marijuana. During the trial, Meneese filed a motion to suppress the air pistol, claiming the search was unlawful. A court commissioner denied the motion to suppress and found Meneese guilty.

¶7  Meneese filed a motion to revise the commissioner's ruling, which the superior court denied. He then appealed, contesting the lawfulness of backpack search. The Court of

---

[1] *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Appeals affirmed, finding that the school search exception applied. *State v. J.M.*, 162 Wn. App. 27, 255 P.3d 828 (2011). Meneese then sought review by this court, which we granted. *State v. Meneese*, 172 Wn.2d 1017, 262 P.3d 64 (2011).

## ISSUE PRESENTED

¶8 Does the school search exception apply to Fry's search of Meneese's locked backpack?

## STANDARD OF REVIEW

■■ ¶9 On appeal, we review the superior court's decision on the commissioner's ruling, not the commissioner's ruling itself. *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). Meneese does not challenge any factual findings. Instead, he challenges the superior court's conclusions of law and its application of law to the facts. Accordingly, we review these issues de novo. *State v. Dow*, 168 Wn.2d 243, 248-49, 227 P.3d 1278 (2010).

## ANALYSIS

■ ¶10 Meneese is claiming that the air pistol should be suppressed because Fry lacked the necessary warrant to search his locked backpack. Absent an exception to the warrant requirement, the search was indisputably unlawful. *See State v. Stroud*, 106 Wn.2d 144, 152, 720 P.2d 436 (1986) (postarrest searches of locked containers require a valid search warrant), *overruled on other grounds by State v. Valdez*, 167 Wn.2d 761, 777, 224 P.3d 751 (2009). The question on appeal is whether, at the time of the search, the school search exception applied to Fry's search.

### 1. School Search Exception

■ ¶11 Both our state and federal constitutions protect persons from unreasonable searches and seizures. U.S.

CONST. amend. IV; WASH. CONST. art. I, § 7 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law."). This means a government actor needs a warrant supported by probable cause to conduct a search unless an exception applies. *State v. McKinnon*, 88 Wn.2d 75, 79, 558 P.2d 781 (1977). These exceptions are " 'jealously and carefully drawn.' " *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

¶12 The school search exception to the warrant requirement is well established under both Washington and federal law. *T.L.O.*, 469 U.S. at 341 (exception to Fourth Amendment); *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 308-09, 178 P.3d 995 (2008) (exception to article I, section 7). It allows a school official to search a student's person if, under all the circumstances, the official has reasonable suspicion. *Id.*

¶13 The Fourth Amendment exception was first recognized in Washington when a high school principal, acting on his own, searched a student after receiving a tip from the local police. *McKinnon*, 88 Wn.2d at 77-78 (decided under Fourth Amendment grounds). The court reasoned that a lower standard applied to the principal because his primary duty was to maintain order and discipline at school, not discover and prevent crime like a police officer. *Id.* at 81. We have since stated that this reasoning also applies under article I, section 7. *See York*, 163 Wn.2d at 308-09. In contrast with teachers and administrators, it is also well settled that law enforcement officers acting on their own are not entitled to this exception. *See McKinnon*, 88 Wn.2d at 81 (reasoning that the high school principal can utilize a lower standard of proof because he is *not* a law enforcement officer); 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.11(b), at 511 (4th ed. 2004).

*2. School Search Exception and SROs*

¶14 Meneese challenges the application of the school search exception to Fry's search of Meneese's back-

pack and argues Fry was a law enforcement officer when he searched the backpack. We agree and hold that in light of the overwhelming indicia of police action, Fry was a law enforcement officer when he searched Meneese's backpack.

¶15 Our holding is guided by the underlying rationale for the school search exception. The underlying rationale is that "teachers and administrators have a substantial interest 'in maintaining discipline in the classroom and on school grounds,'" which often requires swift action. *State v. Slattery*, 56 Wn. App. 820, 824, 787 P.2d 932 (1990) (quoting *T.L.O.*, 469 U.S. at 339). This need for swift action renders the warrant requirement particularly "unsuited to the school environment." *T.L.O.*, 469 U.S. at 340. In effect, the extra burden of requiring a warrant for school searches undermines the need for swift discipline to maintain order, the very purpose behind the search. *Id.* at 341; *McKinnon*, 88 Wn.2d at 81. The State maintains that SROs share this same interest in maintaining discipline and this same concern about immediacy. For example, Fry helps ensure a proper "learning environment for students, teachers, and staff." CP at 26. This is not unlike the principal in *McKinnon* whose chief duty included "maintaining order and discipline in the school." 88 Wn.2d at 81.

¶16 There is, however, a fundamental difference between the principal in *McKinnon* and Fry. The "principal [was] not a law enforcement officer. His job [did] not concern the discovery and prevention of crime. His . . . primary duty [was] maintaining order and discipline in the school." *Id.* Fry *is* a law enforcement officer. Fry's job *does* concern the discovery and prevention of crime, and he has no authority to discipline students. He is a uniformed police officer who "respond[s] to, and address[es], incidents occurring on school grounds." CP at 26. Moreover, his role as SRO does not exempt him from other police duties as he can still be called upon to answer police matters unrelated to the school.

¶17 Further evidence of Fry's role as a law enforcement officer is evident from his search of Meneese's locked back-

pack. Fry had arrested and handcuffed Meneese before searching the backpack. An ordinary school official could not have arrested a student under these circumstances and, most likely, could not have handcuffed a student either, given the nonviolent nature of this offense. At no point during this event did Meneese either use or threaten to use physical force.[2] The overt actions of arresting and handcuffing Meneese, coupled with all the other indicia of police action, illustrate that Fry was a law enforcement officer and not a school official.

¶18 The State is concerned that applying the higher probable cause standard will waste school resources and undermine the purpose of the search by preventing the swift discipline needed to maintain order. First, Fry was already spending additional time keeping Meneese in custody, waiting for backup. Second, there was no need here for swift discipline to maintain order as Meneese was already under arrest and about to be removed from campus regardless of the search. Therefore, this argument is a non sequitur.

¶19 We recognize that our holding is contrary to several foreign jurisdictions that have treated SROs as school officials. *See, e.g., People v. Dilworth*, 169 Ill. 2d 195, 208, 661 N.E.2d 310, 214 Ill. Dec. 456 (1996) (holding that school liaison officer may search with reasonable suspicion); *In re William V.*, 111 Cal. App. 4th 1464, 1471-72, 4 Cal. Rptr. 3d 695 (2003) (same); *R.D.S. v. State*, 245 S.W.3d 356, 369 (Tenn. 2008) (applying lower standard when police officer is

---

[2] While the dissent is correct that school officials may restrain a student using reasonable force where necessary, a school official may not *arrest* a student under these circumstances. The dissent conflates detention and arrest, ignoring extensive Fourth Amendment jurisprudence to the contrary. *See, e.g.,* JOSHUA DRESSLER & ALAN C. MICHAELS, UNDERSTANDING CRIMINAL PROCEDURE 109, 149 (4th ed. 2006) (noting "that circumstances short of an arrest may constitute a less intrusive seizure, subject to a less stringent level of Fourth Amendment review" (citing *Terry v. Ohio*, 392 U.S. 1, 16-19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))). Even Fry acknowledges that ordinary school officials cannot arrest a student for a misdemeanor. Tr., Adjudication Hr'g at 73. Moreover, the dissent's willingness to allow ordinary school officials to handcuff students for nonviolent drug offenses without any discussion is deeply troubling.

associated with the school system). *But see Patman v. State*, 244 Ga. App. 833, 834, 537 S.E.2d 118 (2000) (holding that a search by a police officer on special assignment at a school requires probable cause); Jacqueline A. Stefkovich & Judith A. Miller, *Law Enforcement Officers in Public Schools: Student Citizens in Safe Havens?*, 1999 BYU EDUC. & L.J. 25, 67-69 (1999) (proposing that police operating in schools should be subject to the more stringent probable cause standard because of their extensive training in the " 'niceties of probable cause' " (quoting *T.L.O.*, 469 U.S. at 343)). We do not find those decisions persuasive for two main reasons.

¶20 First, the other jurisdictions rely on state-specific precedent that is simply inapplicable here. *See, e.g., Dilworth*, 169 Ill. 2d at 208; *William V.*, 111 Cal. App. 4th at 1470. And to the extent these cases base their holding on the Fourth Amendment, we note that our case law has consistently demonstrated "that article I, section 7 provides greater protection to an individual's right of privacy than . . . the Fourth Amendment." *State v. Parker*, 139 Wn.2d 486, 493, 987 P.2d 73 (1999). This is true even in the context of school searches. *See York*, 163 Wn.2d at 309-10. As such, even if the Fourth Amendment would allow the school search exception in this case, article I, section 7 would not.[3]

---

[3] Contrary to the dissent's assertion, we do not trample on *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), in stating that article I, section 7 would prohibit such a search. As recognized in *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982 (1998),

> we have an analytical advantage because we know article I, section 7 provides more protection to individuals from searches and seizures than the Fourth Amendment. Our inquiry is no longer whether article I, section 7 provides greater protection but, rather, does the scope of the protection apply to the facts of this case.

Because our previous cases, *York*, and through it *McKinnon*, direct the analysis to be applied, the *Gunwall* analysis is no longer required. *Id.*; *see State v. Eisfeldt*, 163 Wn.2d 628, 637, 185 P.3d 580 (2008).

¶21 Second, these cases are factually distinguishable because they all involved a search prearrest.[4] *See, e.g.*, *Dilworth*, 169 Ill. 2d at 207-08; *William V.*, 111 Cal. App. 4th at 1467-68; *R.D.S.*, 245 S.W.3d at 364. Those courts essentially held that the school search exception should apply to SROs when they "search[ ] a student during school hours on school grounds, in furtherance of the school's education-related goals." *In re Josue T.*, 1999-NMCA-115, 128 N.M. 56, 61, 989 P.2d 431. Even under those courts' reasoning, Fry's search did not further any education-related goals as he had already arrested and handcuffed Meneese. *Cf. Pacheco v. Hopmeier*, 770 F. Supp. 2d 1174, 1183 (D.N.M. 2011) (refusing to apply the school search exception when the initial reason for the search is other than maintaining school security). There was no chance for swift and informal school discipline and further searching primarily promoted criminal prosecution, not education. Accordingly, we do not find the contrary foreign authority persuasive here.[5]

## CONCLUSION

¶22 In sum, we hold that in light of the overwhelming indicia of police action, the school search exception does not apply to Fry's search of Meneese's locked backpack. Fry is a fully commissioned law enforcement officer employed by the Bellevue Police Department who has no ability to discipline students. At the time of the search, Fry was seeking to obtain evidence for criminal prosecution, not evidence for informal school discipline. Further, the search was not to maintain order because Meneese was being removed from school regardless of the search. Therefore, the underlying purpose of the school search exception is not

---

[4] Although we draw a factual distinction between the cases based on the timing of the arrest, this is not to say we would necessarily uphold the search if Fry had searched Meneese prearrest. The factual distinction is merely another reason these cases are not persuasive.

[5] Having concluded that the school search exception does not apply, we decline to address the reasonableness of the search under that standard.

served. Without the application of the exception, Fry required a warrant supported by probable cause to search Meneese's locked backpack. Because Fry lacked the necessary warrant, the search was unlawful and the weapon should be suppressed. We therefore reverse the Court of Appeals and remand for further proceedings consistent with this opinion.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, FAIRHURST, WIGGINS, and GONZÁLEZ, JJ., concur.

¶23 STEPHENS, J. (dissenting) — Schools are special environments. This is why both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution allow student searches in schools to be conducted based on individualized reasonable suspicion, without the necessity of obtaining a warrant supported by probable cause. I would hold that this "school search exception" applies whether a search of a student on school grounds is carried out by a school resource officer (SRO) or another school official, so long as it is related to school policy and not merely a subterfuge for unrelated law enforcement activities. This is the view of the overwhelming majority of jurisdictions to have considered the issue. In rejecting it, the majority departs from persuasive precedent, the record on review, and common sense. Accordingly, I respectfully dissent.

## DISCUSSION

¶24 It is well established that public schools have a responsibility to protect student safety and preserve an orderly educational environment. *See* RCW 28A.150-.240(2)(b) (requiring school staff to "[m]aintain good order and discipline in their classrooms at all times"); *Bravo ex rel. Ramirez v. Hsu*, 404 F. Supp. 2d 1195, 1200 (C.D. Cal. 2005) ("If school officials are to educate their students, they

must maintain a safe and positive learning environment."). One need not "search beyond recent local and national media headlines to understand that schools are, unfortunately, too often turned into places in which children are subjected to grave and even life-threatening dangers wherein the split-second vigilance of teachers and administrators, and the need for clear-headed thinking, is absolutely critical to the safety of the school children." *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 378 n.23 (6th Cir. 1998).

¶25 At the same time, students " 'do not "shed their constitutional rights" at the schoolhouse door.' " *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 303, 178 P.3d 995 (2008) (quoting *Goss v. Lopez*, 419 U.S. 565, 574, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975) (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969))). Students have legitimate expectations of privacy that are protected by the Fourth Amendment and article I, section 7. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995); *York*, 163 Wn.2d at 306.

¶26 The Fourth Amendment protects against "unreasonable searches and seizures." The determination of whether a search is "reasonable" depends upon the context in which it takes place and entails "balancing the need to search" against the intrusion the search requires. *Camara v. Mun. Court*, 387 U.S. 523, 536-37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). The constitutional boundaries of searches in the school setting were considered by the United States Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985).

¶27 Given the serious challenges to order and discipline in schools, the Court in *T.L.O.* recognized that it is not "reasonable" to hamstring school authorities by allowing them only ineffective and onerous methods. *See T.L.O.*, 469 U.S. at 339 ("Maintaining order in the classroom has never been easy, but in recent years, school disorder has often

taken particularly ugly forms: drug use and violent crime in the schools have become major social problems."). To fulfill their educational mission, schools must be accorded flexibility to swiftly diffuse and address problems so they can focus on their mission of teaching students. *See T.L.O.*, 469 U.S. at 339 (" 'Events calling for discipline are frequent occurrences and sometimes require immediate, effective action.' " (quoting *Goss*, 419 U.S. at 580)). In short, "the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Acton*, 515 U.S. at 656. Determining what is "reasonable" involves balancing the "schoolchild's legitimate expectations of privacy and the school's equally legitimate need to maintain an environment in which learning can take place." *T.L.O.*, 469 U.S. at 340.

¶28 In striking a balance between these two interests, *T.L.O.* instructed that a school search need not comply with the requirements for a warrant or probable cause to search. *Id.* at 340-41. Because schools present a special environment, a school search is "reasonable" when it is " 'justified at its inception' " and " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

¶29 A search is " 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341-42. A search is reasonable in scope "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

¶30 This same standard applies under article I, section 7, as this court recognized in *York*, 163 Wn.2d 297. While no opinion in *York* commanded a majority of the court, *all* the justices agreed that individualized reasonable suspicion is the appropriate standard for conducting school searches.

*Compare id.* at 309 ("[T]he school nevertheless needed to articulate some reasonable suspicion to justify a search of a student under both the Fourth Amendment and article I, section 7."), *with id.* at 316 (Madsen, J., concurring), *and id.* at 330 (J.M. Johnson, J., concurring).

¶31 Notwithstanding *York*, today's majority disregards cases applying the reasonable suspicion standard under the Fourth Amendment by invoking the greater protections provided by our state constitution. Majority at 946. The majority simply announces these "greater protections" as a truism while failing to engage in any constitutional analysis, much less an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). But ever since *State v. McKinnon*, 88 Wn.2d 75, 558 P.2d 781 (1977), Washington courts have upheld warrantless school searches based upon reasonable suspicion. Indeed, the parties acknowledge that the standard under the federal and state constitutions are identical. *See* Pet. for Review at 6 ("The test under each constitutional provision is the same. A school search is constitutional 'if the school official has reasonable grounds to believe the search is necessary in the aid of maintaining school discipline and order.' " (quoting *McKinnon*, 88 Wn.2d at 81 (citations omitted))); Suppl. Br. of Resp't at 9-10. Because the parties have neither invoked greater protections under our state constitution nor provided a *Gunwall* analysis, the majority has no basis for charting a new path.

¶32 Instead, the analysis should begin with the recognition that under both article I, section 7 and the Fourth Amendment, the reasonable suspicion standard applies to searches "carried out by school authorities acting alone and on their own authority." *T.L.O.*, 469 U.S. at 341 n.7. The Court in *T.L.O.* explicitly left unanswered the question of whether this standard also applies to "searches conducted by school officials in conjunction with or at the behest of law enforcement agencies." *Id.*

¶33 In *T.L.O.*'s wake, courts in other jurisdictions have considered the proper standard to apply to law enforcement

authorities searching a student at school. Clear trends are evident. "[T]he probable cause standard is consistently applied where outside police officers initiate a search or where school officials act at the behest of law enforcement agencies." *In re Interest of Angelia D.B.*, 211 Wis. 2d 140, 564 N.W.2d 682, 687 (1997) (collecting cases). However, "[a] reasonable suspicion standard applies when school officials, including teachers, teachers' aides, school administrators, school police officers and local police school liaison officers, conduct a search acting on their own authority." *Commonwealth v. J.B.*, 719 A.2d 1058, 1065 (Pa. Super. 1998) (emphasis omitted) (collecting cases).

¶34 Which standard applies in this case thus turns on whether Officer Michael Fry, acting as an SRO, can be considered a "school official" under *T.L.O.* According to the majority, an SRO is not a school official because the officer is a member of the police department who has the authority to, among other things, arrest a student. In my view, the majority's analysis rests on a false dichotomy between school employees and police officers working in schools.

¶35 *T.L.O.* did not delineate whether the category of "school official," for purposes of applying a reasonable suspicion standard, is limited to direct school employees. The Court described the government interest in searching as the "legitimate need to maintain an environment in which learning can take place." *T.L.O.*, 469 U.S. at 340. In fulfilling their responsibility to maintain an environment conducive to learning, schools are increasingly willing to seek the assistance of individuals with specialized training. Some schools hire private security guards, and others " 'have spent millions of dollars to set up professionally trained school police forces that operate around the clock.' " Jacqueline A. Stefkovich & Judith A. Miller, *Law Enforcement Officers in Public Schools: Student Citizens in Safe Havens?*, 1999 BYU Educ. & L.J. 25, 31-32 (1999) (quoting Jessica Portner, *Cops on Campus*, 13 Educ. Week 26, 30 (June 22, 1994)). Still other "local governments have elected

to blend the traditional duties of school officials and law enforcement officers in an effort to protect students and teachers." *R.D.S. v. State*, 245 S.W.3d 356, 367 (Tenn. 2008).

¶36 When SROs are invited by school administration to help maintain an environment in which learning can take place, they are properly considered "school officials" for purposes of applying the *T.L.O.* standard. In such a situation, schools have simply delegated their recognized authority to resource officers who, by virtue of their training, are adept at detecting misbehavior and maintaining order.

¶37 The Bellevue School District has chosen to use SROs in furtherance of its educational mission. The undisputed finding of the trial court is that "Fry was appointed by the Bellevue School District . . . in order to help the school district meet its goal of creating and maintaining a safe, secure, and orderly learning environment for students, teachers, and staff, through prevention and intervention techniques." Clerk's Papers (CP) 26. Fry's letter of appointment from the district superintendent refers to SROs as school officials and expressly empowers them to intervene as school officials. *Id.* Fry's duty as an SRO is to "ensure order, enforce school rules and policies, and ensure the safety of those on school grounds," a role he fulfills "pursuant to his appointment letter from the Bellevue School District." *Id.* at 28. While on school grounds, his "primary function is to act in his capacity as [an SRO]," *id.*, and he "rarely leaves school grounds to answer police matters that are not related to the school," *id.* at 26. The Bellevue School District pays about $15,000 per year to the police department so that Fry can work as an SRO at the high school. *Id.* at 26.

¶38 This is not a situation in which an officer is conducting ordinary law enforcement activity and happens to be on school grounds. Rather, the school has chosen to fulfill its responsibility to maintain an orderly educational environment by engaging Fry as an SRO. Indeed, the dean of students testified that Fry's "primary function is to help

establish order on campus," Adjudication Hr'g at 104, and that she "use[s] him" both for maintaining order and for helping students, *id.* at 105. The record amply supports what both the trial court and the Court of Appeals recognized: Fry is a school official because his primary role is to maintain a safe and orderly educational environment, and he fulfills that role at the request of, and in cooperation with, other school officials.

¶39 The majority's formalistic analysis misses all this. The majority believes "overwhelming indicia of police action" preclude Fry from being considered a school official. Majority at 944. For the majority, the fact that Fry is a "uniformed police officer," *id.*, who cannot discipline students, eliminates the possibility that he is a school official who works with school authorities to achieve an environment that supports learning.

¶40 First of all, whether one qualifies as a school official should not depend on dressing the part. The fact that Fry wore a Bellevue Police Department uniform instead of plain clothes is hardly dispositive of his status. Further, Fry's testimony that SROs are unable to administer school discipline by suspending or expelling students, Adjudication Hr'g at 42, is hardly surprising. Only the school district superintendent, or his or her designee, has such power. WAC 392-400-230(2).

¶41 Finally, the majority makes much of the fact that Fry arrested and handcuffed Meneese, claiming that "[a]n ordinary school official could not have arrested a student under these circumstances," which "illustrate[s] that Fry was a law enforcement officer and not a school official." Majority at 945. The majority's starting premise is wrong: school officials *can* detain or handcuff students in certain circumstances. School personnel are free to use reasonable force to maintain order or prevent a student from harming himself, others, or property. WAC 392-400-235(3)(a); *see Ingraham v. Wright*, 430 U.S. 651, 674, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977) (noting common law privilege allowing

teachers to inflict reasonable corporal punishment); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (noting that legitimate government ends for physical force include student discipline, classroom control, and self-defense). When a student possesses less than 40 grams of marijuana, as Meneese did, teachers and school staff may forcibly restrain the student, in the interest of maintaining order, while waiting for police to arrive. Fry testified he handcuffed Meneese for safety reasons, Adjudication Hr'g at 53, just as any school employee could have in order to protect students, staff, or property.

¶42 But whether Fry's actions and appearance are those usually adopted by teachers is beside the point. The majority's formalistic test is wrong because it posits that one must be *either* a law enforcement officer *or* a school official for purposes of the school search exception. It then looks to qualities possessed by police officers on the one hand, and teachers and school administrators on the other, and finds that Fry's "police-officer-like" characteristics preclude him from acting as a school official. Having the status of police officer, however, does not automatically disqualify an SRO from working in a school and carrying out its policies as a school official.[6]

¶43 The majority's belief that Fry's law enforcement credentials are fundamentally incompatible with being a school official leads it to draw an artificial distinction between Fry and the principal in *McKinnon*. In *McKinnon*, we explained why school searches should be subject to special standards:

---

[6] Even assuming the majority's analysis is correct, it fails to notice the ways in which Fry did *not* act like an outside police officer. As Fry testified, he caught Meneese while doing a "bathroom sweep" to look for tardy students or smokers. Adjudication Hr'g at 87 ("[A]s a sworn police officer, if I was doing normal patrol duties, I wouldn't go sweeping the bathrooms for kids being tardy and smoking."). Moreover, the reason Fry brought Meneese to the dean's office in the first place was to administer school discipline. Adjudication Hr'g at 82 ("I'm not allowed to suspend students so that's why I refer them to the administration to do that part . . . .").

The school's function is to educate children, both intellectually and socially, to prepare them to properly function in our evermore complex adult world. Because of the number of students brought together during a school day, the educational function can only be accomplished by maintaining order and discipline . . . .

The high school principal is not a law enforcement officer. His job does not concern the discovery and prevention of crime. His duty as the chief administrator of the high school includes a primary duty of maintaining order and discipline in the school. In carrying out this duty, he should not be held to the same probable cause standard as law enforcement officers. Although a student's right to be free from intrusion is not to be lightly disregarded, for us to hold school officials to the standard of probable cause required of law enforcement officials would create an unreasonable burden upon these school officials. Maintaining discipline in schools oftentimes requires immediate action and cannot await the procurement of a search warrant based on probable cause. We hold that the search of a student's person is reasonable and does not violate his Fourth Amendment rights, if the school official has reasonable grounds to believe the search is necessary in the aid of maintaining school discipline and order.

88 Wn.2d at 80-81.

¶44 In *McKinnon* we were contrasting regular searches by police officers, which generally require probable cause, with searches by school officials, which we held to require reasonable grounds. *Id.* at 81. In doing so, we were not announcing a bright-line rule that a police officer could never function as a school official. The majority reads too much into *McKinnon*'s statement that "[t]he high school principal is not a law enforcement officer." *Id.* The gist of *McKinnon* is that the principal should not be held to the probable cause standard when "carrying out" his "primary duty of maintaining order and discipline in the school." *Id.* Here, the trial court's unchallenged finding is that Fry's primary duty is "to help the school district meet its goal of creating and maintaining a safe, secure, and orderly learn-

ing environment for students." CP at 26. In this way, Fry's role as an SRO is analogous to the principal's in *McKinnon*. The role (maintaining good order) and the setting (school) are relevant to the status of a school official under *McKinnon* and *T.L.O.* In other words, it is *function*, not *form*, which is of constitutional significance.

¶45 The majority elevates form over function. Clearly, under *T.L.O.* the dean could have searched Meneese's bag herself. Yet the majority finds something sinister in the district's appointee, i.e., Fry, conducting the search in her office and in her presence. But this is not a case in which a police officer used the school-search exception as a subterfuge to pursue his own law-enforcement-related agenda at odds with school policy. The dean testified, and the trial court found, that Fry's search of the backpack in her office was *in accordance* with school disciplinary policy and was an expected, "normal part" of any search of a student caught with drugs. Adjudication Hr'g at 96; CP at 29. Given that, why should the propriety of the search turn on whether Fry has law enforcement credentials?

¶46 The Supreme Court of California has noted the absurdity of drawing a bright line between school police and other school officials:

> The same observation and investigation here could well have been undertaken by a teacher, coach, or even the school principal or vice-principal. If we were to draw the distinction urged by the minor, the extent of a student's rights would depend not on the nature of the asserted infringement but on the happenstance of the status of the employee who observed and investigated the misconduct. Of equal importance, were we to hold that school security officers have less authority to enforce school regulations and investigate misconduct than other school personnel, there would be no reason for a school to employ them or delegate to them duties relating to school safety. Schools would be forced instead to assign certificated or classified personnel to yard and hall monitoring duties, an expenditure of resources schools can ill afford. The title "security officer" is not constitutionally significant.

*In re Randy G.*, 26 Cal. 4th 556, 568-69, 110 Cal. Rptr. 2d 516, 28 P.3d 239 (2001). Applying *Randy G.* to a school resource officer, the California Court of Appeal noted that "[t]he relationship between a student and the 'school police' is no different than that between a student and a school resource officer merely because one is employed by the district and the other by the city." *In re William V.*, 111 Cal. App. 4th 1464, 1470-71, 4 Cal. Rptr. 3d 695 (2003). The *William V.* court concluded that such a "distinction focuses on the insignificant factor of who pays the officer's salary, rather than on the officer's function at the school and the special nature of a public school." *Id.* at 1471. *William V.*'s criticism is apt in this case because the majority's focus on constitutionally insignificant factors allows it to lose sight of Fry's function at the school.

¶47 Finally, there is some suggestion the search was improper regardless of who performed it because of its timing. Because Meneese was already under arrest when Fry searched him, the majority concludes the search was unnecessary to further any of the education-related goals that form the basis for the school search exception. *See* majority at 944-45.[7]

¶48 The majority's analysis misses the mark because the reasons the school search exception exists need not independently justify each school search on a case-by-case basis. The exception turns on the "special environment[ ]" of a school, *York*, 163 Wn.2d at 341 (J.M. Johnson, J., concurring), much as constitutional analysis recognizes prisons and airports are subject to a special needs exception. The United States Supreme Court has made clear that in the school setting, a school official's search is " 'justified at its inception' " whenever reasonable grounds exist to believe a student has violated the law or school rules. *T.L.O.*, 469 U.S.

---

[7] The majority immediately undercuts its own argument by indicating the factual distinction it draws is unimportant. Majority at 947 n.4 ("[T]his is not to say we would necessarily uphold the search if Fry had searched Meneese prearrest.").

at 341-42. The fact that Meneese was to be removed from the school does not alter the fact that Fry had reasonable suspicion. Therefore, the search was "justified at its inception." A school search " 'justified at its inception' " and " 'reasonably related in scope to the circumstances which justified the interference,' " *T.L.O.*, 469 U.S. at 341 (quoting *Terry*, 392 U.S. at 20), is reasonable under the Fourth Amendment and requires no additional justification.

¶49 Today's decision will place school personnel at greater risk of harm because it will "encourage teachers and school officials, who generally are untrained in proper pat down procedures or in neutralizing dangerous weapons, to conduct a search of a student suspected of carrying a dangerous weapon on school grounds without the assistance of a school liaison officer . . . ." *Angelia D.B.*, 564 N.W.2d at 690. Schools will now be dissuaded from using SROs to detect and intercept violations of school rules or the law. Instead, teachers and other school administrators who have reasonable suspicion, but lack probable cause, must conduct such searches themselves. The constitution does not demand such foolhardiness, nor is it necessarily conducive to respect for student privacy. *See William V.*, 111 Cal. App. 4th at 1471 ("[D]rawing such a distinction might force school districts to employ private security guards rather than certified police officers, who may have superior training, which would hardly enhance protection of the students' Fourth Amendment rights.").

¶50 The majority admits its holding "is contrary to several foreign jurisdictions." Majority at 945. In fact, the majority's holding is out of sync with the *great weight* of decisions since *T.L.O.* that have considered whether searches conducted by school resource officers or school liaison officers fall within *T.L.O.*'s exception. *See, e.g., Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) ("[W]e apply the reasonableness standard articulated in [*T.L.O.*] to school seizures by law enforcement officers."); *Cason v. Cook*, 810 F.2d 188, 191 (8th Cir. 1987) (agreeing

with the district court that "the reasonableness standard should apply when a school official acts in conjunction with a police liaison officer"); *Martens ex rel. Martens v. Dist. No. 220, Bd. of Educ.*, 620 F. Supp. 29, 30-32 (N.D. Ill. 1985) (holding that the reasonableness standard applies where outside police officer told student being detained in the dean's office to empty his pockets); *William V.*, 111 Cal. App. 4th at 1470-71 (adopting reasonable suspicion standard for school resource officer); *People v. Dilworth*, 169 Ill. 2d 195, 661 N.E.2d 310, 317, 214 Ill. Dec. 456 (1996) (holding that where liaison police officer worked full time to handle criminal activity and disciplinary problems "in furtherance of the school's attempt to maintain a proper educational environment," *T.L.O.*'s reasonable suspicion standard applies); *In re Josue T.*, 1999-NMCA-115, 128 N.M. 56, 989 P.2d 431, 436 (noting that "the 'reasonable under the circumstances' standard established in *T.L.O.* also has been applied where a school resource officer, on his or her own initiative and authority, searches a student during school hours on school grounds, in furtherance of the school's education-related goals"); *In re D.D.*, 146 N.C. App. 309, 554 S.E.2d 346, 352 (2001) ("[T]he *T.L.O.* standard has also been applied to cases where [an SRO] conducts a search, based upon his own investigation or at the direction of another school official, in the furtherance of well-established educational and safety goals."); *State v. Alaniz*, 2012 ND 76, 815 N.W.2d 234 (holding SRO was school official for purposes of a search); *J.B.*, 719 A.2d at 1065 (applying *T.L.O.* reasonable suspicion standard to search conducted by school police officer); *M.D. v. State*, 65 So. 3d 563, 566 (Fla. Dist. Ct. App. 2011) ("As noted by *all of our sister courts*, a search conducted by a resource officer placed in the school as a liaison is more akin to a search from a school official than from an outside police officer coming into the school to conduct a search . . . ." (emphasis added)); *R.D.S.*, 245 S.W.3d at 369 ("[W]e hold that the reasonable suspicion standard is the appropriate standard to apply to searches conducted by a law enforcement officer assigned to a school

on a regular basis and assigned duties at the school beyond those of an ordinary law enforcement officer such that he or she may be considered a school official as well as a law enforcement officer, whether labeled an 'SRO' or not."); *see also Wilson ex rel. Adams v. Cahokia Sch. Dist. No. 187*, 470 F. Supp. 2d 897, 910 (S.D. Ill. 2007) ("[T]he weight of authority holds, and the Court agrees, that a search of a student on school grounds by a school resource officer at the request of school officials should be deemed a search by a school employee for Fourth Amendment purposes and thus is subject to the reasonableness standard, not the probable cause standard.").

¶51 These cases were *all* based on constitutional principles recognized in Washington, and not on "inapplicable" state law as the majority insinuates.[8] There is simply no sound reason for this court to reject the analysis of our sister jurisdictions, who have carefully considered the issue before us today.

## CONCLUSION

¶52 We should recognize that SROs are school officials subject to the well-established "school search exception" when their conduct relates to school policy and is not a subterfuge for unrelated law enforcement activity. Because the record establishes that SRO Fry had reasonable

---

[8] The majority brushes aside *Dilworth* and *William V.* as relying on "state-specific precedent that is simply inapplicable here." Majority at 946. Actually, *Dilworth* and *William V.* relied on state and federal cases interpreting the Fourth Amendment. *See Dilworth*, 661 N.E.2d at 317 (citing *In re Boykin*, 39 Ill. 2d 617, 237 N.E.2d 460 (1968), decided before *T.L.O.* and holding that a search of a student without probable cause was reasonable under the Fourth Amendment); *William V.*, 111 Cal. App. 4th at 1470 (citing *Randy G.*, 28 P.3d 239, as holding "that for purposes of assessing the validity of a detention under the Fourth Amendment, no meaningful distinction can be drawn" between school security guards and other school officials). While we are not bound by decisions of other states interpreting federal law, and the majority may not find them persuasive, their analysis is certainly applicable to the present case.

suspicion to search Meneese, I would affirm the Court of Appeals.

J.M. JOHNSON, J., concurs with STEPHENS, J.