# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69272-1-I |
| | ) | |
| | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| MATTHEW BRUCH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 21, 2014 |

SPEARMAN, J. — A jury found Matthew Bruch guilty of two counts of child

molestation in the second degree and two counts of rape of a child in the third degree.

Bruch appeals his convictions arguing that the prosecutor committed misconduct in

closing argument by improperly commenting on his trial rights, appealing to the jury's

passions and prejudices, and disparaging defense counsel. He also contends that the

trial court erred in excluding evidence of the victim's reputation for dishonesty and

imposed an indefinite term of community custody. Because none of the challenged

remarks were improper, the court acted within its discretion in excluding the proffered

reputation evidence, and the court imposed a sentence that complies with the statutory

requirement of converting earned early release time to community custody, we affirm.

## FACTS

From approximately 2001 until 2007, when she was between the ages of six and

twelve, J.B. lived in Lake Stevens with her father, Matthew Bruch, his girlfriend, Tara

Osborne (formerly Kerr), her biological brother, Osborne's children, and occasionally

other family members. In 2007, Bruch ended his relationship with Osborne and entered

into a relationship with Julia Mjelde. Bruch, J.B., and her brother moved to Mjelde's residence in Stanwood. Bruch and Mjelde had a tumultuous relationship and on several occasions, Bruch and his children temporarily moved out.

In August 2010, when J.B. was fifteen years old and her father's relationship with Mjelde was ending, J.B. told Mjelde that her father had had sexual contact with her in the past. Mjelde informed the police and J.B. was taken into protective custody. J.B. initially described incidents that took place at the Lake Stevens house. She described an occasion when she and her father were lying on the couch together and Bruch put his hand down the front of her pants and touched her vagina. She said that another time, also on the couch, Bruch reached his hand down her pants and grabbed her buttocks. J.B. asked him why he was doing that and he said, "'I made it'" and "'it's mine.'" 1Report of Proceedings (RP) at 125. She said there were other times when he took her hand, put it around his penis, and made her move her hand back and forth.

J.B. was in foster care for approximately a year. J.B. eventually contacted her aunt in Arizona. Her aunt agreed that J.B. could come and live with her and her partner. A few months after she arrived in Arizona, J.B. told her aunt that her father had raped her twice when she was fifteen.

According to J.B., the first rape occurred when they were still living at Mjelde's Stanwood house. J.B. said that Mjelde and her kids had left the house after her father and Mjelde had a fight and she was watching television on Mjelde's bed with her father. Bruch put his hand over her mouth, flipped over on top of her, pulled down her pants and had sexual intercourse with her. When asked why she did not call the police after

2

this happened, J.B. explained that she was "terrified" of Bruch and she "couldn't fathom what had just happened" and "didn't want to accept it." 1RP at 135-36.

J.B. described a second incident when Bruch, J.B., and her brother were staying at the home of Julia de la Cruz, a friend of Bruch's. J.B. said that she and her father had a fight there. Bruch yelled at J.B., told her she was no longer his daughter, and put her in a small bedroom in the house. J.B. said that after Bruch put her in the room, she tried the door but couldn't open it. Eventually, Bruch came back. He apologized and climbed into bed with her. J.B. said that again, Bruch got on top of her, pulled her pants down, and had sex with her. J.B. gave a statement about the rapes to an Arizona detective.

The Snohomish County Prosecutor's Office charged Bruch with two counts of second degree child molestation and two counts of rape of a child in the third degree and designated all counts as involving domestic violence.[1] Following a trial, the jury convicted Bruch as charged. Bruch appeals.

## Prosecutorial Misconduct

Bruch claims that the prosecutor made several improper comments during closing argument that rose to the level of prosecutorial misconduct. We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003); State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). A prosecutor has wide latitude in closing argument to

---

[1] The State also charged Bruch with one count of bail jumping but filed a motion to dismiss this count before trial.

draw reasonable inferences from the evidence. State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). A prosecutor may not, however, make statements that are unsupported by the evidence or invite the jurors to decide a case based on emotional appeals to their passions and prejudices. In re Det. of Gaff, 90 Wn. App. 834, 841, 954 P.2d 943 (1998); State v. Jones, 71 Wn. App. 798, 808, 863 P.2d 85 (1993). To prevail on a claim of prosecutorial misconduct, a defendant must establish that the prosecutor's comments were improper and that the comments were prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008).

First, Bruch contends that the prosecutor improperly focused on J.B.'s difficulty in testifying and thereby invited the jury to penalize him for exercising his right to confront witnesses at trial.

Several witnesses described J.B.'s emotional difficulty in talking about the abuse. Both counsel also referred to the obvious distress she displayed on the witness stand. Bruch's counsel suggested that J.B.'s emotion during her testimony stemmed from the fact that she had falsely accused her father. The prosecutor contended that J.B.'s testimony was credible, in part, because of her demeanor. He also argued that J.B. was reluctant to disclose the abuse for a variety of complex reasons, including the fact that she still loved her father and because she anticipated many of the negative consequences that would follow. The prosecutor argued:

> You could see that she knew what she was getting herself into.
> And it was horrible for her; horrible for her to answer my
> questions about what happened to her; horrible for her to answer
> defense counsel's questions about what she might or might not
> have said in a transcript; . . . 4RP at 653.

Bruch did not object.

4

During rebuttal argument, the State responded to the defense contention that J.B. fabricated the allegations against her father in order to further her own objectives. The State pointed out that, far from benefitting from her disclosures, J.B. suffered numerous serious adverse consequences, including the emotional cost of her testimony. The prosecutor stated: "It's an incredibly regrettable part of our legal process" that essentially "victimized" J.B. again, by requiring her testimony. 4RP at 699. The court overruled Bruch's objection to this comment.

The appellant claims that the prosecutor "directly faulted Mr. Bruch [sic] for exercising his constitutional right to a trial" and causing harm to J.B. Appellant's Brief at 14. We disagree.

While the State may not draw adverse inferences from a defendant's exercise of his constitutional rights, not all arguments that touch upon those rights are impermissible. State v. Gregory, 158 Wn.2d 759, 806, 147 P.3d 1201 (2006). The relevant questions are whether the prosecutor manifestly intends the remark to be a comment on the defendant's trial rights and whether the exercise of constitutional rights is the focus of the argument. Gregory, 158 Wn.2d at 807.

General discussion of the emotional toll of a victim's testimony offered to support the victim's credibility does not amount to an improper comment on the defendant's right to confrontation. See Gregory, 158 Wn.2d at 808 (argument focused on the credibility of the victim, not on the defendant's exercise of his constitutional right to confrontation). The cases Bruch relies upon are not analogous. See e.g., State v. Jones, 71 Wn. App. 798, 805-06, 863 P.2d 85 (1993) (prosecutor expressly criticized the defendant's exercise of his right to confrontation by commenting on the effect of the defendant's

behavior in court on the victim). In the context of the argument about credibility, it was not improper for the prosecutor to discuss J.B.'s obvious difficulty when she testified. The prosecutor did not criticize the defendant for subjecting J.B. to cross examination, nor suggest or imply that Bruch should have pleaded guilty to spare the victim from having to testify. The argument did not infringe upon Bruch's right to confrontation.

Next, Bruch also argues that the prosecutor unfairly appealed to the jury members' passions and prejudices. Bruch points to the prosecutor's comment that J.B.'s life was "no fairytale," his reference to the "absolute devastation" caused by rape perpetrated by a parent, and argument in rebuttal that, far from having an agenda to destroy her father, J.B. would do "anything to have a dad who just took her fishing." 4RP 651, 663, 697. Bruch fails to demonstrate that any of these remarks, when viewed in context, were unwarranted by the evidence or incurably prejudicial. Cf., State v. Claflin, 38 Wn. App. 847, 850-51, 690 P.2d 1186 (1984) (prosecutor's reading of a poem "utilizing vivid and highly inflammatory imagery" describing rape's emotional effect was "so prejudicial that no curative instruction would have sufficed to erase the prejudice it was bound to engender in the minds of the jurors"). Bruch cannot show that any arguable prejudice could not have been addressed by a timely objection and curative instruction.

Finally, Bruch contends that the State committed misconduct by belittling the defense's argument as a "fairytale" and predicting that defense counsel would argue for a "long while" about J.B.'s credibility. 4RP at 652; 663.

It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn counsel's integrity. State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d

6

43 (2011). In Thorgerson, for example, the court agreed that the State committed misconduct when it accused the defense of engaging in "sleight of hand" and used disparaging terms such as "'bogus'" and "'desperation.'" Thorgerson, 172 Wn.2d at 451-55. However, the court concluded that this misconduct was not prejudicial because it was not likely to have altered the outcome of the case. Thorgerson, 172 Wn.2d at 452.

In contrast, here, the State did not accuse defense counsel of deceiving the jury nor malign counsel's integrity in any manner. Defense counsel's cross examination of some witnesses focused on the timing of J.B.'s disclosures and her missed opportunities to fully disclose what happened to her. The questioning suggested that the defense would argue extensively about J.B.'s credibility and would suggest that the timing and evolving nature of her disclosures were reasons to doubt the truth of her testimony. In response to this anticipated argument, the State argued in favor of a different interpretation of the evidence, contending that the way J.B. reluctantly disclosed the abuse over time lent authenticity to her account. Here again, Bruch failed to object to the comments of which he now complains. And in any event, the State's comments were a fair response to the defense's theory of the case, not misconduct.

## Reputation Evidence

Bruch contends that the trial court abused its discretion by refusing to admit evidence of J.B.'s reputation for dishonesty in her former school community. Bruch sought to present the testimony of Jordan Kerr, the son of his former girlfriend, who attended Arlington High School for a year with J.B. before she moved to Arizona.

During voir dire, Kerr said that J.B. had a reputation for dishonesty based on the opinion of one of J.B.'s former boyfriends and some of his friends, and the opinion of Kerr's uncle's girlfriend, and three or four of her friends who Kerr met once or twice, but did not really know. Kerr said that his uncle's girlfriend and her friends did not like J.B. because she would sometimes "cry for no reason" and do "weird things." 4RP at 607. Kerr said that J.B.'s former boyfriend thought J.B. was dishonest because of an incident when she apparently thought she was pregnant and told another boy, but did not tell her boyfriend. Kerr also told a couple of the people he mentioned that J.B. had falsely accused him of molesting her when they lived together.

ER 608 allows the admission of evidence of a witness's reputation for untruthfulness in the community to attack the credibility of a witness. Gregory, 158 Wn.2d at 804. A witness's reputation is deemed reliable where the witness is well known in a substantial community. State v. Land, 121 Wn.2d 494, 499, 851 P.2d 678 (1993). To establish a valid community, the party seeking to admit the reputation evidence must show that the community is both neutral and general. Gregory, 158 Wn.2d at 804. Factors relevant to this showing may include "the frequency of contact between members of the community, the amount of time a person is known in the community, the role a person plays in the community, and the number of people in the community." Land, 121 Wn.2d at 500. Whether a party has established the proper foundation for reputation testimony is a matter within the trial court's discretion. Gregory, 158 Wn.2d at 804-05. A trial court abuses its discretion when it acts in a manner that is manifestly unreasonable or based on untenable grounds or reasons. Land, 121 Wn.2d at 500.

8

As the trial court noted, the testimony offered by Kerr described J.B.'s reputation only among two small circles of people within the school community. According to Kerr, one of these groups thought J.B. was "weird" and did not like her. The other group included several people who had reason to be biased against her. Under these circumstances, the trial court acted well within its discretion in concluding that the community was not sufficiently general or neutral and in excluding the evidence.

Sentence

The court imposed a standard range term of confinement of 116 months. The court also imposed community custody of four months "plus all accrued earned early release time at the time of release." Clerk's Papers (CP) at 7. Bruch challenges his sentence, arguing that the sentencing court imposed an indefinite term of community custody, in violation of RCW 9.94A.701, which requires fixed community custody terms.

Child molestation in the second degree is a class B felony with a statutory maximum sentence of ten years. RCW 9A.44.086(2); RCW 9A.20.021(l)(b). Felony sex offenders are also subject to community custody, supervised by the Department of Corrections. RCW 9.94A.701; RCW 9.94A.501(4). While RCW 9.94A.701 authorizes a 36-month term of community custody for Bruch's offense, the trial court properly reduced the term to four months so as not to exceed the statutory maximum sentence. See RCW 9.94A.701(9). Because Bruch is a sex offender, any early release time he earns on the confinement portion of his sentence must be converted to community custody. RCW 9.94A.729(5)(a) ("A person who is eligible for earned early release as provided in this section and who will be supervised by the department ... shall be transferred to community custody status in lieu of earned release time.")

9

Bruch relies on cases in which the trial court failed to reduce the term of community custody so as not to exceed the statutory maximum. State v. Boyd, 174 Wn.2d 470, 275, P.3d 321 (2012); State v. Land, 172 Wn. App. 593, 295 P.3d 593, rev. denied, 177 Wn.2d 1016, 304 P.3d 114 (2013); State v. Winterborne, 167 Wn. App. 320, 273 P.3d 454, rev. denied, 174 Wn.2d 1019, 282 P.3d 96 (2012). In each of those cases, the trial court merely added a notation that the defendant could not serve a sentence in excess of the statutory maximum. But here, the sentencing court reduced the term of community custody to four months to avoid exceeding the 120-month maximum. As we have previously determined, the conversion of earned early release to community custody is required by statute and the fact that the amount of earned early release that will be converted is unknown does not render the sentence indefinite. State v. Winkle, 159 Wn. App. 323, 331, 245 P.3d 249 (2011), rev. denied, 173 Wn.2d 1007, 268 P.3d 942 (2012) ("The SRA specifically states that a sentence is not rendered indeterminate by the fact that a defendant may earn early release credits.").

We affirm.

_____
Spearman, J.

WE CONCUR:

_____      _____
Leach, C.J.                   Appelwick, J.